FILED
2025 Mar-28  PM 12:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **MARY DOE,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | |
| } | **Case No.:  5:22-cv-01238-MHH** |
| **CITY OF MADISON BOARD OF** } | |
| **EDUCATION,** } | |
| } | |
| **Defendant.** } | |

## MEMORANDUM OPINION AND ORDER

In this action, Mary Doe, a former James Clemens High School student, alleges that the City of Madison Board of Education violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, by discriminating against her and acting with deliberate indifference in its handling of her sexual assault charge against another student.  Ms. Doe also asserts a 42 U.S.C. § 1983 claim against the Board.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Board has asked the Court to enter judgment in its favor.  (Doc. 35).  To resolve the motion, the Court first discusses the summary judgment standard.  Then, applying that standard, the Court summarizes the summary judgment evidence, presenting the evidence in the light most favorable to Ms. Doe, the non-movant.  Finally, the Court

1

applies the law that governs Ms. Doe's claims to the evidence to determine whether the record contains disputed facts that a jury must resolve.

## I.

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). When considering a motion for summary judgment, a district court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015).

## II.

Viewed in the light most favorable to Ms. Doe, the evidence shows that, during the 2019–2020 school year, Ms. Doe was a sophomore at James Clemens

High School in Madison County, Alabama.   (Doc. 37-1, p. 6, tp. 14).   During the

school year, a male student, D.W., sexually assaulted her.  (Doc. 37-1, p. 7, tp. 19).

Three other students alleged that D.W. also sexually harassed them that year:  J.G.,

R.M., and K.W.  (Doc. 37-1, pp. 13–14, 16; Doc. 37-2, pp. 27–28).   The City of

Madison Board of Education and the school district's Superintendent oversee the

administrative staff at James Clemens High School. (*See, e.g.*, Doc. 37-4, pp. 92–

103).    During  the  2019–2020  school  year,  Robby  Parker  was  the  district's

Superintendent, Eric Terrell was the Assistant Superintendent, Brian Clayton was

the Principal of James Clemens High School, and Jennifer Flanagan and Jason Watts

were Assistant Principals of James Clemens High School.  (Doc. 37-3, pp. 6–7, 24).

The facts concerning the sexual assault are largely undisputed.  On November

19, 2019, on a school bus ride, D.W. sat next to Ms. Doe and repeatedly grabbed her

breast.  (Doc. 37-1, p. 8).  When D.W. exited the bus at his stop, Ms. Doe told her

brother, T.L., what had happened.  (Doc. 37-1, pp. 8–9).  When Ms. Doe and T.L.

got home, T.L. told their mother, Jane Doe, about the assault.  (Doc. 37-1, p. 9, tp.

27).

Jane Doe called the Madison City Police Department.  (Doc. 37-1, p. 9, tp.

27–29).  An investigator for the City of Madison Police Department went to the

Does' home the evening of November 19, 2019.  (Doc. 37-1, pp. 9–10, 26–28).  On

November 20, 2019, a school resource officer informed Assistant Principal Watts of the alleged assault. (Doc. 37-11, p. 3, ¶ 4).

Mr. Watts informed Assistant Principal Flanagan of the alleged assault. (Doc. 37-1, p. 29). Ms. Flanagan wanted to get a statement from Ms. Doe, but Ms. Doe was not in school that day. (Doc. 37-1, p. 29). The same day, Mr. Watts called D.W. to his office and questioned him about the allegations. (Doc. 37-11, p. 3, ¶ 5). D.W. admitted that he grabbed Ms. Doe's breast. (Doc. 37-11, p. 3, ¶ 5).

Ms. Flanagan met with Ms. Doe and her mother on November 21, 2019. (Doc. 37-1, pp. 29–30). Ms. Doe provided the following written statement:

> We were riding the bus home and [D.W.] had his own seat and I sat in my seat he then moved to my seat. We started talking about our geometry class and the teacher. D.W. grabbed my boob. I asked him to stop but he just laughed. He tried to grab me more but I pushed hands away and told him to stop[, and] he said o-k. After that he got off the bus and I told my brother. There are other girls on my bus that have been touched/grabbed ([V.C.] and her friend).

(Docs. 37-1, p. 25). Ms. Flanagan checked Ms. Doe's spring schedule and saw that Ms. Doe and D.W. were scheduled for the same geometry class. (Doc. 37-1, p. 30). Ms. Flanagan changed D.W.'s schedule so that he would not be in Ms. Doe's geometry class. (Doc. 37-9, p. 14, tp. 49–50). According to Ms. Flanagan, Ms. Doe seemed hesitant to talk about the incident. (Doc. 37-6, p. 32). Ms. Flanagan told Ms. Doe that she could schedule time with the school's enrichment counselor.

4

(Docs. 37-1, p. 30; 37-9, p. 16, tp. 58). Ms. Doe opted not to speak with a counselor at that time. (Doc. 37-1, pp. 14–15).

During the November 21, 2019, meeting, Ms. Doe reported to Ms. Flanagan that D.W. had touched other students and mentioned J.G. (Doc. 37-1, p. 30). Ms. Flanagan called J.G. to her office. (Doc. 37-1, p. 30). J.G. told Ms. Flanagan that D.W. had touched her butt and breast and had attempted to touch her front privates. (Doc. 37-1, p. 30). J.G. was not sure when the assault occurred but indicated that it most likely occurred on November 18, 2019. (Doc. 37-3, pp. 65–66).

Ms. Flanagan also called T.L. to her office. (Doc. 37-1, p. 30). T.L. stated that D.W. had inappropriately touched two other students, V.C. and R.M. (Doc. 37-1, p. 30). Ms. Flanagan spoke with both students. (Doc. 37-1, p. 30). V.C. shared that she had witnessed a male student touch J.G. inappropriately on the school bus. (Doc. 37-1, pp. 30–31). R.M. denied being touched inappropriately. (Doc. 37-1, p. 31).

On December 2, 2019, the Board held a disciplinary hearing regarding Ms. Doe's allegations. (Doc. 37-4, p. 13, tp. 44; Doc. 37-8, pp. 21–22). Assistant Superintendent Terrell served as the hearing officer. (Doc. 37-4, p. 21). D.W., D.W.'s parents, and Dr. Clayton attended the hearing. (Doc. 37-3, p. 20, tp. 71). Mr. Watts presented the evidence. (Doc. 37-3, p. 20). During the hearing, the bus video footage was discussed and witness statements were presented as evidence.

(Doc. 37-4, pp. 14, 111–12).  During the hearing, D.W. admitted to inappropriately grabbing Ms. Doe's breast.  (Doc. 37-4, p. 109).  When asked if he had touched any other students inappropriately, D.W. denied doing so.  (Doc. 37-4, p. 109).

The Student Code of Conduct provides that "sexual harassment" and "sexual offenses" are a class three violation.  (Doc. 37-4, p. 13, tp. 41; Doc. 37-11, p. 5, ¶ 9).  Possible consequences of a class three violation include out-of-school suspension, transfer, an alternative education program, referral to an outside agency, expulsion, and restitution.  (Doc. 37-4, p. 10).  Mr. Terrell recommended that D.W. receive 25 days in Alternative School as discipline, effective immediately.  (Doc. 37-4, p. 14, tp. 46).[1]  Ms. Flanagan noted that the school would have to create a plan for D.W.'s bus transportation when he returned from Alternative School.  (Doc. 37-1, p. 32).

On December 5, 2019, Dr. Clayton and Ms. Flanagan spoke with Ms. Doe again.  (Doc. 37-1, p. 35; Doc. 37-13, p. 9, ¶ 20).  Ms. Doe reported that in addition to the incident on the bus ride home, D.W. had touched her butt earlier that same day on the morning bus ride to school. (Doc. 37-1, p. 13, tp. 47).[2]

On December 6, 2019, Ms. Doe's father met with Dr. Clayton and Ms. Flanagan to express concern that the school had not yet provided bus video footage

---

[1] Alternative School is held at the high school.  (Doc. 37-6, pp. 12–13).

[2] The record indicates that at some point in the investigation, Ms. Doe recalled that D.W. hit her chest with the back of his hand while she was getting on the bus the morning of November 18, 2019.  (Doc. 37-2, p. 10).

to the police. (Doc. 37-13, p. 10, ¶ 22). Later that week, Mr. Watts received video footage from the school bus that showed D.W. touching J.G. inappropriately on November 14, 2019. (Doc. 37-8, p. 23, tp. 86). D.W. was suspended from the Alternative School, and a second disciplinary hearing was scheduled to consider D.W.'s case given the new evidence of sexual misconduct. (37-8, p. 12, tp. 44).

After the second disciplinary hearing on December 17, 2019, Mr. Terrell recommended to Superintendent Parker that the district expel D.W. (Doc. 37-4, p. 17, tp. 57–58). Superintendent Parker, Mr. Terrell, and Dr. Clayton met with D.W. and D.W.'s parents to discuss consequences. (Doc. 37-14, pp. 3–4, ¶¶ 4–5). D.W.'s parents were upset to hear that D.W. might be expelled. (Doc. 37-14, p. 4, ¶ 6). Superintendent Parker noted that homebound services would meet the goals of disciplining D.W. and removing him from campus, while allowing him to continue his education for the remainder of the year. (Doc. 37-14, p. 4, ¶ 5). D.W.'s parents agreed to the homebound proposal and weekly counseling sessions at a local counseling center. (Docs. 37-4, p. 22, tp. 77; 37-9, p. 34). While receiving homebound services, D.W. was not permitted to participate in extracurricular activities or visit the James Clemens campus. (Doc. 37-11, p. 8, ¶ 15).

On January 22, 2020, another student, K.W., approached Ms. Flanagan to report that D.W. had touched her inappropriately in September and October 2019. (Doc. 37-2, pp. 27–28). K.W. shared that D.W. had grabbed her chest and crotch

multiple times and asked her to send inappropriate pictures to him. (Doc. 37-2, pp. 27–28). When he learned of these allegations, Superintendent Parker decided that D.W.'s homebound services sufficiently disciplined D.W. for his actions, protected other students, and deterred future harm. (Doc. 37-16, p. 11, ¶ 20).

Later that winter, Superintendent Parker resigned, and Assistant Superintendent Terrell became the Acting Superintendent. (Doc. 37-4, pp. 24–25, tp. 87–90). After he assumed his new role, Mr. Terrell did not alter D.W.'s discipline. (Doc. 37-4, pp. 25–26).

Ms. Doe did not ride the school bus again after the incident on November 19, 2019. (Doc. 37-2, p. 20, tp. 72). In the months after she reported the assault, Ms. Doe saw D.W. once in the hallway while he was in Alternative School. (37-1, p. 17, tp. 63). After D.W. was placed on homebound services, Ms. Doe did not see him for the remainder of the school year, in part because in March 2020, the entire school transitioned to remote learning because of the COVID pandemic. (Doc. 37-1, p. 17, tp. 63; Doc. 37-4, pp. 22–23, tp. 80–81).

The 2020–2021 school year began remotely. (Doc. 37-4, pp. 22–23, tp. 80–81). In October 2020, students returned to the James Clemens High School campus. (Doc. 37-3, p. 48, tp. 182–83; Doc. 37-4, pp. 22–23, tp. 80–81). D.W.'s homebound services had come to an end, and he returned to campus too. (Doc. 37-8, p. 15, tp. 53–55). While in gym class that month, Ms. Doe saw D.W. on the football field.

(Doc. 37-1, p. 18, tp. 67–68).  Seeing D.W. on the field made Ms. Doe feel nervous.

(Doc. 37-1, p. 19, tp. 70).[3]   On October 26, 2020, Ms. Doe's father submitted a

written request to the Board, asking that Ms. Doe and her brother T.L. be transferred

from James Clemens to Bob Jones High School.  (Doc. 37-3, p. 47, tp. 177).  The

transfer was difficult for Ms. Doe.  She explained:

> Well, at first I was, like, like, tried to be not bothered by it.  But then
> after a while when, like, I was in the same math class as him and stuff
> like that, they told me that if I didn't feel comfortable that I can move
> to a different class.  And I remember coming home and, like, why do I
> have to, like, leave?  And it kind of sucks, like, having to move to Bob
> Jones and not graduating with all my friends that I went to high school
> with, and then graduating with, half, like, some random people that I
> didn't know because of what happened.

(Doc. 37-1, p. 20, tp. 75–76).  According to Ms. Doe's parents, Ms. Doe had become

"very distant" and "started isolating herself" and "[s]he wasn't the same girl."  (Doc.

37-2, p. 21, tp. 74; Doc. 37-7, p. 26, tp. 97).

On September 22, 2022, Ms. Doe, through her mother Jane Doe, filed this

action against the City of Madison Board of Education and James Clemens High

School Principal Brian Clayton.  (Doc. 1).  On December 7, 2023, the parties filed a

joint stipulation dismissing Dr. Clayton as a defendant in this case.  (Doc. 43).  Only

the claims against the Board remain.

---

[3] Ms. Doe's brother T.L. testified that he had a feeling "people knew about" D.W.'s assault on Ms. Doe, and he "overheard people talking about it."  (Doc. 37-6, p. 18).

III.

Pursuant to Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  The Supreme Court has recognized an implied private right of action for damages under Title IX.  *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 75–76 (1992).  Entities that receive federal financial assistance may be held liable when they are "deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school."  *Davis ex rel. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999).

Funding recipients may be held liable for student-on-student harassment. *Davis*, 526 U.S. at 646–47.  A plaintiff seeking relief for student-on-student harassment must establish that the defendant is "a Title IX funding recipient;" an "appropriate person" had "actual knowledge of the discrimination or harassment;" the funding recipient acted with "deliberate indifference to known acts of harassment in its programs or activities;" and the discrimination at issue was "so severe, pervasive, and objectively offensive that it effectively bars the victim's

10

access to an educational opportunity or benefit." *Williams v. Bd. of Regents*, 477

F.3d 1282, 1293 (11th Cir. 2007) (quotations omitted).

An "appropriate person" is, "at a minimum, an official of the recipient entity

with authority to take corrective action to end the discrimination." *Gebser v. Lago*

*Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). The deliberate indifference

standard requires Title IX plaintiffs to show that the appropriate person's response

to reported sexual harassment was "clearly unreasonable in light of the known

circumstances." *Davis*, 526 U.S. at 648. A plaintiff may meet this burden by

showing that the funding recipient "failed to take any precautions that would prevent

future attacks" or failed to exercise any control over the perpetrator in light of known

prior sexual misconduct. *Williams*, 477 F.3d at 1297. With respect to the "severe,

pervasive, and objectively offensive" requirement, the Supreme Court in *Davis*

stated:

> Whether gender-oriented conduct is "harassment" thus "depends on a
> constellation of surrounding circumstances, expectations, and
> relationships," including, but not limited to, the ages of the harasser and
> the victim and the number of individuals involved. Courts, moreover,
> must bear in mind that schools are unlike the adult workplace and that
> children may regularly interact in ways that would be unacceptable
> among adults. . . . Moreover, the provision that the discrimination occur
> "under any education program or activity" suggests that the behavior
> be serious enough to have the systemic effect of denying the victim
> equal access to an educational program or activity. Although, in theory,
> a single instance of severe one-on-one peer harassment could be said to
> have such an effect, we think it unlikely that Congress would have
> thought such behavior sufficient to rise to this level in light of the
> inevitability of student misconduct and the amount of litigation that

11

would be invited by entertaining claims of official indifference to a single one-on-one peer harassment. . . . The relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program or activity.

526 U.S. at 652–53 (internal citations omitted). The effect of the conduct on a student's ability to receive an education "must be real and demonstrable." *Hawkins v. Sarasota Cnty. Sch. Bd.*, 322 F.3d 1279, 1289 n. 13 (11th Cir. 2003).

It is undisputed that James Clemens High School receives Title IX funds and that an "appropriate person" with the authority to take corrective measures had actual notice of Ms. Doe's allegations. Therefore, to resolve the Board's motion for summary judgment, the Court must determine whether the Board's actions amount to deliberate indifference. The Court also must consider whether the sexual discrimination at issue meets the "severe, pervasive, and objectively offensive" standard.

## A.

Ms. Doe contends that the Board was deliberately indifferent in imposing on D.W. discipline short of expulsion. Title IX funding recipients do not have to "'remedy' peer harassment." *Davis*, 526 U.S. at 648 ("The dissent consistently mischaracterizes [Title IX's reasonableness standard] to require funding recipients to "remedy" peer harassment . . . and to 'ensur[e] that . . . students conform their conduct to certain rules . . .. Title IX imposes no such requirements."). A Title IX

12

recipient must "respond to known peer harassment in a manner that is not clearly unreasonable." *Davis*, 526 U.S. at 648–49; *see also Adams v. Demopolis City Sch.*, 80 F.4th 1259, 1270 (11th Cir. 2023) ("A school district is not deliberately indifferent simply because the measures it takes to stop the harassment or discrimination ultimately are ineffective."); *Sauls v. Pierce Cnty. Sch. Dist.*, 399 F.3d 1279, 1785 (11th Cir. 2005) (finding that a school district was not deliberately indifferent to reports of sexual harassment when its officials timely responded to complaints and performed an internal investigation by interviewing the involved parties despite those efforts ultimately being ineffective at remedying the harassment); *but see Gebser*, 524 U.S. at 290 ("[A]n official decision by the recipient not to remedy the violation" amounts to deliberate indifference to known discrimination.).

The evidence, viewed in Ms. Doe's favor, does not present a genuine issue of material fact as to the Board's handling of Ms. Doe's assault by another student. There is no evidence that school administrators had knowledge of D.W.'s conduct before Ms. Doe reported her assault. (Docs. 37-12, pp. 6–7; 37-13, p. 3). When they learned of the assault, school administrators immediately investigated, followed established disciplinary procedures, and disciplined D.W. after he acknowledged that he sexually assaulted Ms. Doe. (Doc. 37-11, p. 3).

Specifically, on the day a student resource officer told Assistant Principal Watts about the assault, he met with D.W. (Doc. 37-11, p. 3). After D.W. admitted that he assaulted Ms. Doe, Assistant Principal Watts suspended D.W. pending a disciplinary hearing. (Doc. 37-11, pp. 3–4). School administrators investigated not only Ms. Doe's assault allegations but also reports of other assaults that came to light during the investigation of the assault on Ms. Doe. (Doc. 37-11, pp. 4–5). The Board held two disciplinary hearings regarding D.W.'s actions, one concerning Ms. Doe's assault and the other concerning another alleged assault victim. (Doc. 37-11, pp. 4, 7).

D.W.'s initial disciplinary hearing was held less than two weeks after D.W. assaulted Ms. Doe. (Doc. 37-11, pp. 3–4). This hearing confirmed that D.W. had assaulted Ms. Doe, and D.W. was placed in Alternative School. (Doc. 37-11, p. 6). School administrators then held a second disciplinary hearing regarding the other assault allegations against D.W. (Doc. 37-11, pp. 7–8). After the second hearing, Superintendent Parker placed D.W. in homebound services for the remainder of the school year. (Doc. 37-11, p. 8). These actions do not evidence deliberate indifference. *See, e.g., Sauls*, 399 F.3d at 1285.

Ms. Doe argues that the Board should have expelled D.W. after the second disciplinary hearing. After learning of evidence that D.W. had assaulted students other than Ms. Doe, Superintendent Parker determined that D.W.'s homebound

14

services consequence sufficiently protected James Clemmens students and deterred D.W. from future misconduct. For this decision to create of factual dispute concerning deliberate indifference, Ms. Doe would have to offer evidence that the Board had "'knowledge that its remedial action [was] inadequate and ineffective'" and did not take reasonable action to "'eliminate the behavior.'" *Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1261 (11th Cir. 2010) (quoting *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000)). The record does not contain evidence in that vein.

Superintendent Parker concluded that the remedial action taken against D.W. addressed D.W.'s sexual misconduct and adequately addressed the risk of harm to other students. There is nothing in the record to indicate that Superintendent Parker's action was inadequate or ineffective. The record does not indicate that D.W. assaulted Ms. Doe or another student after D.W. was placed on homebound learning. Ms. Doe saw D.W. once after while he served his first consequence in Alternative School and did not see D.W. again until the following school year, after he had completed his homebound punishment. (Doc. 37-1, p. 19).

The Court understands that Ms. Doe disagrees with the Board's decision to forego expulsion and place D.W. on homebound learning and understands that she too experienced consequences because of D.W.'s misconduct. On this record

though, Ms. Doe has not presented evidence that warrants a jury trial of her Title IX

claim against the Board.[4]

B.

Ms. Doe has abandoned her equal protection claim against the Board because

she has not offered argument regarding the claim in opposition to the Board's motion

for summary judgment.[5]  During oral argument, after the Board noted the omission,

counsel for Ms. Doe stated, "we felt like the case that was cited in our brief []

contains the law sufficient to address [the equal protection claim] and therefore we

---

[4] Because Ms. Doe has not presented evidence to create a disputed question of material fact with respect to the deliberate indifference element of her Title IX claim, the Court will enter judgment for the Board on that claim. *See Adams v. Demopolis City Schools*, 80 F.4th 1259, 1272 (11th Cir. 2023) (resolving the Title IX claim on the deliberate indifference element).  The Court recognizes that, "[i]n the context of student-on-student harassment, damages are only available where the behavior is so severe, pervasive, and objectively offensive that it denies its victims equal access to education." *Hawkins*, 322 F.3d at 1288. (citation omitted).  "The "severe and pervasive" standard imposes a high burden on Title IX plaintiffs seeking damages based on student-on-student harassment and necessitates a highly fact-intensive inquiry. *Hawkins*, 322 F.3d at 1288 (identifying the surrounding circumstances, expectations, relationships, and ages of the involved parties as relevant facts in determining whether conduct satisfies the severe and pervasive standard).  The underlying behavior "must be serious enough to have the systemic effect of denying the victim equal access to an educational program or activity." *Hawkins*, 322 F.3d at 1288.  The Court need not decide whether the evidence Ms. Doe presented is akin to the evidence in cases like *Williams* and *Hill*.  *Williams*, 477 F.3d at 1299 (sexual assault and rape by student athlete); *Hill v. Cundiff*, 797 F.3d 948, 972-73 (11th Cir. 2015) (finding actionable assault where "the administrators effectively participated in [the] sexual harassment by setting Doe up in a rape-bait scheme involving [the perpetrator] in order to 'catch him in the act'"); *compare Hawkins*, 322 F.3d at 1288 (declining to find Title IX violation where although "the conduct alleged was persistent . . . [and] included sexually explicit and vulgar language and acts of objectively offensive touching," the victims reported only being "upset by the harassment" and pretending to be sick on several occasions to avoid going to school; such harm did not satisfy the "severe, pervasive, and objectively offensive" standard).

[5] At the conclusion of her brief, Ms. Doe requested only that the "Court deny the Board's Motion for Summary Judgment" as to her Title IX claim. (Doc. 42, p. 21).

16

submit that the issue is before the Court."[6]  "In opposing a motion for summary

judgment, 'a party may not rely on his pleading to avoid judgment against him.' . . .

'[G]rounds alleged in the complaint but not relied upon in summary judgment are

deemed abandoned." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599

(11th Cir. 1995) (*en banc*).  "[A] legal claim or argument that has not been briefed

before the court is deemed abandoned and its merits will not be addressed." *Access*

*Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004).  Citing case law

but failing to advance a factual argument or legal analysis applying such case law

constitutes abandonment of a claim. *Brooks v. Ins. House, Inc.*, 322 Fed. Appx. 782,

784 (11th Cir. 2009) ("But Plaintiff fails to apply the cited case law to the facts of

her case; she fails to set out error in the district court's application of the law in this

matter.").  Under this authority, on the record here, Ms. Doe has abandoned her equal

protection claim.

IV.

For the reasons stated above, the Court grants the City of Madison Board of

Education's motion for summary judgment.  The Clerk of Court shall please TERM

Doc. 35.  By separate order, the Clerk of Court will close this file.

---

[6] A transcript of the hearing is available upon request.

**DONE** and **ORDERED** this March 28, 2025.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE